II. ANALYSIS
A. Hostile Work Environment Based on Sexual Orientation
At the heart of this case are Plaintiffs' allegations that they were subjected to a hostile work environment on the basis of sexual orientation in violation of DCHRA.[13] To the detriment of their allegations, Plaintiffs have adopted an "everything but the kitchen sink" litigation strategy, by which every perceived impropriety, trivial slight, or unwelcome management decision is alleged to have contributed to a hostile work environment. The Court has spent an inordinate amount of time scrutinizing Plaintiffs' facts and attempting to impose order on the parties' arguments with regard to which claims find support in the facts of record. See Tr. of Status Conference (June 30, 2016) at 2-3.
However, on summary judgment it is the moving party-the District-that bears the burden of demonstrating that no genuine issue of material fact exists as to each remaining Count. In this analysis, Plaintiffs are given the benefit of all reasonable inferences that may be derived *57 from the facts and the Court assesses the totality of the circumstances to determine whether a claim is supported. See, e.g., Brooks v. Grundmann , 748 F.3d 1273, 1276 (D.C. Cir. 2014) (noting that the strength of a plaintiff's hostile work environment claim is determined by the "totality of the circumstances") (quoting Baloch v. Kempthorne , 550 F.3d 1191, 1201 (D.C. Cir. 2008) ). Having considered all of the circumstances, the Court concludes that Plaintiffs' allegations are sufficient to raise a genuine issue of material fact as to their claim of a hostile work environment on the basis of sexual orientation. Anderson , 477 U.S. at 249-50, 106 S.Ct. 2505.
1. Timeliness
Ms. Weeks filed her first OHR complaint on March 31, 2008; in it, she alleged harassment on the basis of sexual orientation in violation of DCHRA, including the following allegations in her written statement:
DISPARATE TREATMENT
In early 2007, I began a relationship with another officer (lesbian). From March 2007 thru present, when my Sergeant (SGT) was informed of our relationship, my partner and I was [sic ] not allowed to ride together as other officers (heterosexual) who were involved in relationships were allowed to. The department tried to say that we could not ride together because we were assigned to different Patrol Service Area (PSA); however other officers (heterosexual) who were also assigned to different PSA's [sic ] were allowed to ride together.
HARASSMENT
From early 2007 thru present, two SGTs (heterosexual) have made remarks about my partner and me, in regards to our relationship (lesbian), and also threatened me with disciplinary write ups. My SGT (heterosexual) made comments regarding my relationship with other officers and officials.
Since I began working for the Department, I have always received "Exceeds Expectations" ratings for my performance evaluation. However, in February 2008, I received an "Average" rating on my evaluation, which was performed by a SGT (heterosexual) who was not my direct supervisor.
Weeks OHR Complaint (Mar. 31, 2008).[14] The Court interprets Ms. Weeks's complaint of harassment to raise a claim of hostile work environment. Because DCHRA provides that such complaints may be brought within one year of the latest alleged behavior, Ms. Weeks's OHR complaint was timely if any of the alleged harassing incidents of which she complains occurred on or after March 30, 2007. See D.C. MUN. REGS. tit. 4, § 105.1. Ms. Weeks alleged that her sergeant (presumably Sgt. Podorski, who was her sergeant until August 2007) did not allow her and Ms. Jones to ride together "[f]rom March 2007 thru present," even though "other officers (heterosexual) who were involved in relationships were allowed to" ride together, including some who were "assigned to different PSA's [sic ]." Weeks OHR Complaint (Mar. 31, 2008). Ms. Weeks also alleged that, [f]rom early 2007 thru present, two SGTs," presumably Sgts. Podorski and Washington, "have made remarks about my partner and me, in regards to our relationship (lesbian), and also threatened me with disciplinary write ups." Id. Ms. Weeks also mentioned her lowered November 2007 performance rating, which she claimed to have received in February *58 2008, and which she alleged was an harassing incident motivated by Sgt. Podorski's disapproval of Plaintiffs' relationship. See id.
The District challenges the timeliness of Ms. Weeks's OHR complaint. The District argues that "[a]ny sexual orientation claims based on discrete incidents occurring before October 3, 2007 are time-barred," because that date is 180 days before March 31, 2008, when Ms. Weeks filed her OHR complaint. See Mot. at 55-56. This argument is based on the D.C. Code requirement that a claim of discrimination under DCHRA is timely only if the claimant first consults with an EEO counselor within 180 days of a discriminating incident. Id. Ms. Weeks counters that, as to her hostile environment complaint, the statute of limitations is one year, not 180 days, see D.C. MUN. REGS. tit. 4 § 105.1, and because her complaint is based on a theory of a hostile work environment, i.e. , "HARASSMENT," she need only have alleged one incident contributing to ongoing illegal hostility within the relevant time period.
The Court finds that Ms. Weeks's March 31, 2008 complaint to OHR raised a timely claim of a hostile work environment based on sexual orientation, sex, and retaliation under DCHRA (Counts I, III and VII). That complaint included a subsection titled "HARASSMENT" in which Ms. Weeks alleged "remarks" by Sgts. Podorski and Washington about her relationship with Ms. Jones and threatening disciplinary write-ups, as well as her temporarily lowered performance rating. See Weeks OHR Complaint (Mar. 31, 2008). Harassment based on an employee's protected status-here, sexual orientation, sex, and protected activity under DCHRA-is a descriptor of a hostile work environment which is shown by a series of ongoing events that are sufficiently severe and pervasive to interfere unreasonably with an employee's work performance. A number of Ms. Weeks's allegations occurred within the one-year time frame. See Brooks , 748 F.3d at 1278 (" '[A] plaintiff may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard,' but a hostile work environment claim is not rendered invalid 'merely because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own.' ") (quoting Baird v. Gotbaum , 662 F.3d 1246, 1252 (D.C. Cir. 2011) ). Moreover, the District's argument about the timeliness of allegations based on "discrete" acts simply does not apply to the hostile work environment claims at bar. See, e.g., Baird , 662 F.3d at 1251-52 ("[T]he district court erred to the extent that it categorically excluded [plaintiff's] time-barred complaints in considering the hostile work environment claim, thus failing to employ the Morgan analysis, including, of course, a determination of which acts exhibit the relationship necessary to be considered 'part of the same actionable hostile environment claim.' ") (quoting Morgan , 536 U.S. at 103, 122 S.Ct. 2061 ).
The District also argues that Ms. Weeks failed to file her original OHR complaint (March 31, 2008) within 15 days of receiving her Exit Letter (December 14, 2007) so that all of her DCHRA claims should be dismissed. DCHRA provides that "timely filing of a complaint with [OHR] shall toll the running of the statute of limitations while the complaint is pending." D.C. CODE § 2-1403.16(a). The District is correct concerning any claims by Ms. Weeks that were not based on an alleged hostile work environment. As to her allegations of a hostile work environment, due either to her sexual orientation, sex, or in retaliation *59 for her protected activity, her complaint is timely under D.C. law.
Although a closer question, the Court is not persuaded by the District's further argument that Ms. Weeks failed to raise an adequate claim of a hostile work environment. The District argues that the initial OHR complaint filed by Ms. Weeks "clearly alleged sexual orientation discrimination" but not a hostile work environment. Reply at 3-4. However, as stated above, the Court interprets Ms. Weeks's OHR complaint-alleging harassment through "remarks" by Sgts. Podorski and Washington about her relationship with Ms. Jones, threatening discipline, and a lowered evaluation score-as advancing a claim of a hostile work environment. Ongoing harassment due to protected status is exactly what may be sufficiently severe so as to constitute a hostile work environment that intrudes on an employee's ability to work.
Ms. Jones also filed her original OHR complaint on March 31, 2008, describing similar allegedly hostile acts, including the incident in which Sgt. Podorski allegedly refused to sign Ms. Jones's report and threw it on the ground in anger. See Jones OHR Complaint (Mar. 31, 2008). As did Ms. Weeks, Ms. Jones included a section entitled "HARASSMENT." Ms. Jones filed her OHR Complaint almost immediately after receiving her Exit Letter, see Jones Exit Letter (Mar. 28, 2008). Some of the allegedly ongoing behaviors took place during the one-year period before that filing with OHR. Therefore, Ms. Jones timely complained of a hostile work environment due to her sexual orientation, sex, and/or retaliation for protected activities under DCHRA.
2. Merits
At this point in this litigation, Plaintiffs allege that they experienced a hostile work environment on the basis of sexual orientation beginning in September 2006, when they informed Sgt. Podorski that they were in a same-sex relationship. Plaintiffs contend that the news of their relationship led to different treatment throughout the fall of 2006, with increasingly hostile behavior in 2007 and later. They argue that they were subjected to harassing comments in the workplace, with Sgt. Podorski criticizing each woman to the other and making disparaging remarks about the relationship in the fall of 2006. See, e.g. , Jones Dep. at 109-10 (recalling that around this time Sgt. Podorski told Ms. Jones that Ms. Weeks was a "drama queen" and "poison"). They complain that Sgt. Podorski prevented them from bidding on the same PSA in late fall 2006 because he assigned Ms. Jones to be out on duty during bidding. In addition to this central complaint, Plaintiffs allege that Sgt. Podorski frequently targeted Plaintiffs with hostility such as his inappropriately posted notice concerning their UFIRs in January 2007 to embarrass Plaintiffs, see Jones Dep. at 55-56; Weeks Dep. at 85; made other staffing decisions to prevent them from riding together during the fall of 2006 and into the spring of 2007, see, e.g. , Jones OHR File at 13-14 (alleging that Sgt. Podorski's Roll Call assignments were discriminatory); shouted "Do you want to f-k?" at them during a Bike Week party in May 2007, see, e.g. , Podorski Dep. at 66; gave or encouraged others to give both Plaintiffs lower-than-deserved performance evaluation ratings in November 2007, see Jones Annual Evaluation 2007; 3d Am. Compl. ¶ 99;[15] and *60 refused to sign a routine report for Ms. Jones in March 2008, see Jones Dep. 52-53.
Plaintiffs also allege hostility on the part of Sgt. Washington: allegedly, he asked Ms. Weeks why she "switched to being with women" while driving together to South Carolina for Bike Week in May 2007, see Washington Dep. at 77-79; assigned Ms. Weeks to the Marjorie Court temporary detail in September and October 2007, see Washington Dep. at 55; Weeks IAD Interview at 9-11;[16] had Ms. Weeks investigated for "neglect of duty" in October 2007, see Weeks Dep. at 176-78, and marked her as AWOL the following month, see Weeks AWOL Investigation Memorandum; marked Plaintiffs out for two hours, rather than the one hour they requested, when they attended a wedding in October 2007, see, e.g. , Weeks Dep. at 176; and expressed anger toward Plaintiffs when he allegedly told Ms. Jones in November 2007 "you can feed the dogs but they will bite you," and "You and your girl f-ked up." See Jones PD-119 Report. Ms. Weeks also testified that Sgt. Washington's girlfriend told Ms. Weeks that he had described Ms. Jones as "the butch one" and Ms. Weeks as "the femme one," which Ms. Weeks considered evidence of Sgt. Washington's inappropriate focus on their sexual orientation. Weeks Dep. at 95-97. Sgt. Washington testified that he did not recall using those terms, but that the description was "a known impression" in 7D. Washington Dep. at 79.
The District counters that its actions were based on the legitimate needs of the workplace and not motivated by animus based on Plaintiffs' sexual orientation or protected activity. For example, the District argues that Plaintiffs had increased UFIRs when they worked together (a point Plaintiffs do not challenge) and that Ms. Jones had long been known by her colleagues to be a lesbian, so it would not make sense to attribute hostility in the workplace against Ms. Jones due to her relationship with Ms. Weeks. See Def.'s Undisputed ¶ 13. Additionally, the District raises non-discriminatory bases for the allegedly hostile behavior of Sgts. Podorski and Washington. Aside from the danger posed by Plaintiffs' UFIRs when they worked together, the District contends that Sgt. Podorski's alleged hostility toward Plaintiffs is traceable to their refusal to follow his orders in handling the domestic violence call on September 24, 2006. Similarly, Sgt. Washington became frustrated *61 and angry when Plaintiffs outright refused, in September 2007, to arrest a prostitute suspected of stealing a reported stolen car as he ordered.
To determine whether a work environment is hostile, courts look to " 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " Vickers v. Powell , 493 F.3d 186, 197 (D.C. Cir. 2007) (quoting Faragher v. City of Boca Raton , 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) ). The alleged hostility must be "severe or pervasive" to support the claim. Stewart v. Evans , 275 F.3d 1126, 1133 (D.C. Cir. 2002) ; accord Oncale v. Sundowner Offshore Serv., Inc. , 523 U.S. 75, 78, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ; Harris , 510 U.S. at 21, 114 S.Ct. 367. A court's determination is not based on a single factor but on the totality of the circumstances and "the timeline of events as a whole." See, e.g., Brooks , 748 F.3d at 1276.
In this analysis, "not all abusive behavior, even when it is motivated by discriminatory animus, is actionable"; rather, to support a claim of hostile work environment the plaintiff must show that "offensive conduct 'permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment.' " Stewart , 275 F.3d at 1133 (quoting Barbour v. Browner , 181 F.3d 1342, 1347-48 (D.C. Cir. 1999), and Oncale , 523 U.S. at 78, 118 S.Ct. 998 ). In Baloch v. Kempthorne , the D.C. Circuit specifically held that "the totality of circumstances" failed to support a hostile work environment claim where "none of the comments or actions directed at [the plaintiff] expressly focused on his race, religion, age, or disability"; there was no evidence of "tangible workplace consequences"; and the employer identified "legitimate reasons and constructive criticism" for the letters of reprimand at the center of the plaintiff's claims. Baloch , 550 F.3d at 1201. Similarly, in Brooks , the D.C. Circuit affirmed summary judgment against a plaintiff who complained of a hostile work environment on the basis of her race and gender and argued that abusive conduct added to an "alleged aura of hostility," but could not point to any explicitly discriminatory comments or actions. See Brooks , 748 F.3d at 1276-77.
The District urges the Court to adopt the reasoning of Bryant v. Brownlee , 265 F.Supp.2d 52 (D.D.C. 2003). It tries to frame Plaintiffs' hostile work environment claims as simply an amalgam of the sergeants' alleged improper actions, which may have been uncivil but were separated by gaps of time, rendering them only ordinary workplace trials and tribulations. In Bryant , however, the district court granted summary judgment after determining that almost "none of the events described in plaintiff's 21-page complaint [had] any racial or age-related overtones." Bryant , 265 F.Supp.2d at 64 (emphasis added). The two alleged incidents in Bryant that were not "completely neutral" with regards to any protected status were comments by co-workers, one of whom allegedly called the plaintiff an extremely offensive racial epithet while in a Metro station, and the other of whom allegedly told plaintiff that she believed "black women were at the bottom" of a perceived hierarchy for advancement in government jobs. Id. at 64. The Bryant case is not, however, the perfect analog that the District wishes it were. Mses. Weeks and Jones allege that Sgt. Podorski explicitly disparaged their relationship and made sexual comments, in the context of other allegedly hostile actions *62 that could be interpreted to have been motivated by hostility based on the relationship; Ms. Jones also alleges that Sgt. Smallwood, also her superior, asked her if he could "have a kiss." Such allegations of explicit sexual behavior, or inappropriate comments regarding the same-sex relationship, render the comparison to Bryant inapposite. See, e.g., Hammel , 206 F.Supp.3d at 239 (discussing a manager's inappropriate reference to plaintiff's and other employees' sexual orientation).
The District also argues that "Plaintiffs' multiple complaints regarding personnel decisions"-including the claim at the heart of this case, that Sgt. Podorski began to separate them after learning of their same-sex relationship-do not support a harassment claim. The District argues that its "legitimate need to manage employee staffing levels and employee assignments is not trumped by Plaintiffs' desire to ride in the same car." Mot. at 39. Of course, this is true-so long as the need is legitimate. The problem is that D.C. has discarded the records that would show officer assignments so that a comparison of Plaintiffs' experience and that of others could be made. As a result, the nature of MPD's legitimate needs and Plaintiffs' experiences between fall 2006, when Plaintiffs informed Sgt. Podorski of their same-sex relationship, and August 2007, when Ms. Weeks transferred to the midnight shift under Sgt. Washington, must be based on credibility determinations of witness testimony by a fact-finding jury.[17]
Further to this point, the District argues that Mses. Jones and Weeks had increased UFIRs when they worked together, which provides a legitimate, nondiscriminatory reason why Sgt. Podorski separated them. While Plaintiffs complain that Sgt. Podorski inappropriately posted information about their UFIRs, they do not deny the number of UFIRs they filed. Ultimately, the written record is insufficient to make this determination and a jury will have to evaluate witness credibility.[18]
Further potential evidence of a hostile work environment could be found by a jury in Sgt. Podorski's drunken shout, "Do you want to f-k?" during a party at Bike Week. The District argues that the outburst was an isolated incident and stresses that it occurred outside of work. It cites Bergbauer v. Mabus , 934 F.Supp.2d 55 (D.D.C. 2013), in which summary judgment was granted even though the plaintiff's supervisor had touched her sexually on one occasion outside of work.
*63 It is true that antidiscrimination statutes do not constitute "a general civility code." Oncale , 523 U.S. at 81, 118 S.Ct. 998. It is also true that Sgt. Podorski's outburst occurred in a social setting, away from the District of Columbia. However, the party was attended by many coworkers and supervisors and the offending comment was made by a direct supervisor. Actions outside the workplace can contribute to a hostile work environment. See, e.g., Greer v. Paulson , 505 F.3d 1306, 1314 (D.C. Cir. 2007) ("We join our sister circuits in rejecting a per se rule against considering incidents alleged to have occurred while an employee was physically absent from the workplace."). While a single offensive utterance outside the workplace does not create a hostile work environment at work, the Court cannot make that distinction here on the written record. Further, it is uncontested that Sgt. Podorski lowered the annual evaluations of Mses. Jones and Weeks (whose rating was quickly raised by another sergeant) in late fall 2007.
As the District correctly argues, "not everything that makes an employee unhappy is an actionable adverse action," and allegations must objectively contribute to the discrimination alleged in order to be actionable. See Mot. at 39 (quoting Lester v. Natsios , 290 F.Supp.2d 11, 28 (D.D.C. 2003) ). The Court finds that this principle bars Plaintiffs from presenting the entirety of their allegations to a jury. Some of the incidents of which Plaintiffs complain are mere trivialities that do not support their allegations. These include Sgt. Washington asking Ms. Weeks "a couple times" to ride their motorcycles to work together in August 2007; Sgt. Podorski throwing a form to the floor in annoyance in March 2008; Sgt. Washington accusing Ms. Weeks of being AWOL in October 2007 when she was admittedly AWOL and did not learn of this AWOL until a full year later-i.e. , clearly it could not have created a hostile work environment in 2007; and Sgt. Washington marking each Plaintiff absent for two hours, the minimum time for personal leave, when they reported for work late after attending a wedding. Plaintiffs do not dispute the MPD policy to grant such personal leave in two-or-four hour increments or that Sgt. Washington marked them out before he left 7D, before they arrived at 7D, and before he knew when Plaintiffs actually reported for work. In addition, Plaintiffs did nothing to correct the record, not speaking with Sgt. Washington or the timekeepers. This small snafu is merely one of those trivial annoyances any employee might suffer.
The Court also finds that Sgt. Washington's assignment of Ms. Weeks to the temporary Marjorie Court detail in the fall of 2007 was provoked by her refusals to follow his direct orders to arrest the prostitute driving a stolen car. Ms. Weeks complains she could not ride with Ms. Jones and that Sgt. Washington had "informed other officers who asked for the Marjorie Court detail that he was 'saving this for my girl.' " Weeks OHR Complaint (Apr. 20, 2009) at 3; see also Washington Dep. at 157 (stating that he did not recall saying he was saving the Marjorie Court detail for Ms. Weeks but that "[i]t may have happened"). Ms. Weeks does not deny that she refused to follow Sgt. Washington's direct order, that she argued with him about it, and that he became angry as a result. This uncontested insubordinate conduct provides a legitimate non-discriminatory reason for Sgt. Washington's temporary assignment not connected by word or inference to Ms. Weeks's sexual preference.[19]
*64 The Court also finds that the uncontested evidence related to CDR Maupin's "body-for-body" policy is insufficient to suggest that he targeted Plaintiffs because of their sexual orientation. Ms. Weeks identified a single comparator, whom she thought may have been allowed to transfer between bids despite the alleged policy. See Weeks Dep. at 130-32. That single possible example does not discount the legitimate business purpose of CDR Maupin in deciding not to institute the mandatory transfer of a replacement-or work short-handed-to accommodate a transfer request outside the bid process. CDR Maupin suggested that Plaintiffs file an EEO complaint about Sgt. Podorski with IAD if they wanted to do so but they apparently decided to forego that route. Notably, Plaintiffs do not complain that CDR Maupin failed to investigate their report that Sgt. Podorski was treating them inequitably, but only complain about the body-for-body policy, as to which they have no evidence of illegal hostility.
Finally, some of Plaintiffs' allegations of inappropriate sexual comments by co-workers cannot as a matter of law support their claims. Where these allegations concern the offensive behavior of other non-supervisory officers that was not reported, MPD cannot be held liable. See, e.g., Curry v. D.C. , 195 F.3d 654, 660 (D.C. Cir. 1999) (holding that an employer may be held liable for harassment by a non-supervisory co-worker only if the employer knew or should have known of harassment and failed to take appropriate remedial action). Thus, Officer Pristoop's alleged offer to pay Plaintiffs to watch them have sex, see Jones Dep. at 264-66, and Officer Chapman's allegedly encouraging Ms. Weeks to "go back" to dating men, see 3d Am. Compl. ¶ 18, do not support Plaintiffs' claims, because there is no evidence that either Plaintiff told MPD about these incidents.
B. Hostile Work Environment Based on Sex
1. Timeliness
Plaintiffs' charges of gender discrimination under Title VII must have been brought within 300 days of at least one of the acts alleged to have contributed to the hostile work environment or they are time-barred. See Glenn v. Williams , 2006 WL 401816 at *15. Plaintiffs' amended OHR Complaints, in which Plaintiffs first raised allegations of a hostile work environment based on sex, were signed on April 20, 2009, see Weeks OHR Complaint (Apr. 20, 2009); Jones OHR Complaint (Apr. 20, 2009), but because Plaintiffs' counsel emailed Plaintiffs' statements amending their OHR complaints on April 1, 2009, the Court accepts April 1, 2009 as the date the amended charges were filed. See Juliette Niehuss Email (Apr. 1, 2009).[20] Given the *65 April 1, 2009 filing date, Plaintiffs must have alleged at least one incident contributing to the alleged hostile work environment that occurred on or after June 5, 2008 (300 days before April 1, 2009).
Ms. Jones's amended OHR complaint contains no allegations based on incidents that occurred on or after June 5, 2008. See Jones OHR Complaint (Apr. 20, 2009). The latest incidents alleged in Ms. Jones's amended OHR complaint occurred in May 2008. Ms. Jones's Title VII claims are therefore time-barred.
The amended OHR complaint filed by Ms. Weeks, in contrast, alleged two incidents that occurred after June 5, 2008: (1) she learned in August 2008 (before moving to the Detectives' Office) that she had received an AWOL charge and had been the subject of an AWOL investigation in October 2007; and (2) she was not treated as well as her male colleagues in the 7D Detectives' Office and discovered on February 17, 2009 an open tampon in her desk at the Detectives' Office. See Weeks OHR Complaint (Apr. 20, 2009). The other incidents described in the amended OHR complaint occurred before June 5, 2008.
2. Merits
Although her claim is timely, Ms. Weeks fails to make out a case of hostile work environment based on sex under DCHRA (Count III) or Title VII (Count V). Both plaintiffs' sex discrimination arguments rely on the theory that they suffered harassment in 7D because they, as women in a lesbian relationship, failed to conform to "typical gender stereotypes." Weeks Opp'n at 28; Jones Opp'n at 26-27. Ms. Weeks also alleges that she was subjected to a hostile work environment due to her sex when she became an Investigator in November 2008 and joined the Detectives' Office. Again, she attributes "examples of the harassment" to "[her] non-conformity with gender stereotypes and perceptions about her sexual orientation," not to her female sex. Weeks Opp'n at 34.[21]
*66 This Court disagrees with those courts that have held that Title VII prohibits discrimination based on sexual orientation; whether it should have then, or should be amended to do so now, the Court finds no suggestion that the Congress of 1964, or the Supreme Court cases, intended the language of Title VII to be so broad. Rather, this Court agrees with the District that sexual orientation is a separate class of protected individuals and notes that Plaintiffs make such allegations in Count I. A change in federal law awaits congressional action. For this reason, as well as the untimeliness of Ms. Jones's Title VII charge, the lack of merit to Ms. Weeks's Title VII sex-discrimination charge, and the lack of merit to Plaintiffs' DCHRA charge of sex discrimination, this Court will grant summary judgment to the District on Counts III and V.
Even were Ms. Weeks's allegations based on her sex, rather than her sexual orientation, the Court finds that she fails to demonstrate a hostile work environment in the Detectives' Office. Ms. Weeks alleges that her "cases, search warrants, and other job duties" were routinely given to "male investigators or detectives with less experience." Weeks Opp'n at 33.[22] She offers no specifics and, on the question of whether cases were transferred to males when they were ripe for arrest warrants, she provided only vague testimony that this happened one time. While Ms. Weeks argues in brief that she was told "to not be so 'timid,' " id. , she testified that she was asked whether she was "timid." See Weeks Dep. at 259. Ms. Weeks claims that she was "ridiculed" by Sgt. King, her supervisor in the Detectives' Office, when she requested training. Weeks Opp'n at 34. In fact, however, Sgt. King did not express ridicule but annoyance at Ms. Weeks's having sought help outside the unit. See Avis King Email (Dec. 9, 2008). This incident had nothing to do with Ms. Weeks's sex; moreover, Sgt. King's email was directed to all officers who reported to Sgt. King and did not name or otherwise identify Ms. Weeks. See id. Ms. Weeks also complains that, when she became a detective, she wanted to work in homicide but initially received less desirable assignments; her personal preference does not provide evidence that the assignment was based on her sex. Finally, as to the incident involving an unused tampon, Ms. Weeks interpreted it as an aggressive act against her as a woman and makes a general assertion that the District is responsible for maintaining the workplace. See Mot. at 13. While the tampon may have offended Ms. Weeks, it was not threatening or even particularly offensive. It appears to have been, at worst, an anonymous crass joke. These allegations do not raise a genuine issue of material fact as to whether Ms. Weeks suffered severe or pervasive harassment in the Detectives' Office.
Plaintiffs also bring sex-based hostile work environment claims under DCHRA, supported by the same facts as those alleged in support of their Title VII claims. See Weeks Opp'n at 28-34; Jones Opp'n at 26-31. For the same reasons discussed in the context of her Title VII claim, summary judgment will also be granted as to Ms. Weeks's sex-based harassment claims under DCHRA.[23]
*67 C. Hostile Work Environment Based on Retaliation
Finally, Plaintiffs allege that they were subjected to a hostile work environment in retaliation for their complaints about harassment due to their sexual orientation, in violation of DCHRA. See D.C. CODE § 2-1402.61(a) (2001) (establishing that retaliation constitutes an "unlawful discriminatory practice" under DHCRA). To prevail on such a claim, a plaintiff must show that she was subjected to " 'discriminatory intimidation, ridicule, and insult' of such 'sever[ity] or pervasive[ness] [as] to alter the conditions of [her] employment and create an abusive working environment.' " Hussain 435 F.3d at 366 (quoting Harris , 510 U.S. at 21-22, 114 S.Ct. 367 ).
Plaintiffs allege that the workplace hostility "became even more abusive" after they complained, which included their superiors making "specific reference to [their] having engaged in protected activity." See, e.g. , Jones Opp'n at 47. Plaintiffs place their first complaints in January 2007, when they spoke together to Lt. Derek Larsen about Sgt. Podorski, telling Lt. Larsen that they did not want to work with Sgt. Podorski anymore because of the way he had been treating them. See Jones Dep. at 69, 72-79. Around the same time, Ms. Weeks also spoke to Sgts. Levenberry and Smallwood about Sgt. Podorski's alleged harassment; she claims that although they informed her of her right to file an EEO complaint, they warned that if she did so, Sgt. Podorski might claim that she had slept with him. See Weeks Dep. at 63. In February 2007, Plaintiffs also discussed Sgt. Podorski's allegedly harassing behavior with Lt. Rosenthal. See Weeks Dep. at 333; Rosenthal Dep. at 59-62. Several months later, in October 2007, Plaintiffs went out on stress leave, filing forms with MPD that identified Sgts. Podorski and Washington by name and advanced allegations of harassment. Plaintiffs filed their OHR complaints in March 2008 and amended them in April 2009. A reasonable juror could conclude that these complaints support a retaliatory hostile work environment claim.
Plaintiffs allege that Sgt. Washington confronted Ms. Jones in November 2007 and "yelled ... '[y]ou can feed the dogs but they will bite you,' " which she understood to be a threat related to her complaints of harassment. See Jones Disputed ¶ J088; Washington Dep. at 83-84 ("I think I may have said that, yeah."). According to a written statement in one of Ms. Jones's administrative complaints, on January 22, 2008 Sgt. Washington said to her, "Y'all pulled that shit. You jumped on the band wagon with Weeks. I always been straight with you. That shit is f-ked up. You and your girl f-ked up." Jones PD-119 Report (Jan. 22, 2008). Both Plaintiffs also believe that their lowered performance ratings of "meets expectations" by Sgt. Podorski in November 2007 were motivated by retaliatory animus.[24]
*68 The District counters that Plaintiffs' retaliation claims fail, primarily because the claims are based on the same facts as the hostile work environment claims, which the District argues have not been established. As stated above, the Court disagrees with the premise of this argument.
The District also argues that Plaintiffs' allegations are insufficiently severe or pervasive to alter the conditions of their employment, but, again, the Court disagrees. Plaintiffs' allegations suggest that, in the wake of their taking concrete steps to raise their claims of discrimination and harassment based on sexual orientation in fall 2007, Sgt. Podorski and, later, Sgt. Washington became increasingly hostile toward them. In particular, Plaintiffs attribute Sgt. Podorski's lowered performance evaluations in 2007 as well as increased anger and hostility from Sgts. Podorski and Washington in late 2007 and January 2008 to retaliatory motives. From the written record, the Court cannot make the credibility determinations needed to decide the facts, i.e. , whether the alleged harassment was sufficiently severe or pervasive to interfere with Plaintiffs' abilities to perform their jobs, and whether it was provoked by disdain for their sexual orientation or in retaliation for their complaints.
The District's motion for summary judgment will be denied as to Count VII.
III. CONCLUSION
For the foregoing reasons, the District's Motion for Summary Judgment [Dkt. 90] will be granted in part and denied in part. The motion will be granted as to Counts III and V in Plaintiffs' Third Amended Complaint [Dkt. 26]; Counts II, IV, VI, and IX, which Ms. Jones has withdrawn, will be dismissed with prejudice. The District's motion will be denied as to Counts I and VII.
Plaintiffs also have moved for attorney fees and costs. See Motion for Attorney Fees and Costs [Dkt. 78]. This motion will be denied without prejudice as premature. The Court will consider any motions for attorney fees and costs after the completion of this case.
A memorializing Order accompanies this Opinion.

Mses. Jones and Weeks have filed separate Statements of Material Facts in Dispute. Weeks Disputed [Dkt. 93-1]; Jones Disputed [Dkt. 96-1]. Given the lengthy discovery process and a history of inaccuracies in this case, the Court relies on underlying documents in the record in assessing the allegations on summary judgment.

The parties' briefs and record documents confirm that Ms. Weeks's OHR complaint misstated the date of her performance evaluation, which occurred in November 2007.

Ms. Weeks also points to MPD's internal assessment of Plaintiffs' complaints, the Vaughan-Roach Report, in which MPD's internal reviewer concluded that Sgt. Podorski improperly gave Plaintiffs "meets expectations" ratings in November 2007, and that his behavior toward them appeared to have been motivated by personal factors unrelated to job performance. See MPD Internal Memo on Plaintiffs' Claims [Dkt. 93-6] (Vaughan-Roach Report). The Vaughan-Roach Report, authored by an MPD employee named Sharon Vaughan-Roach, included a summary of internal mediation related to Plaintiffs' complaints, as well as Ms. Vaughan-Roach's findings regarding the allegations. There is insufficient information in the record regarding Ms. Vaughan-Roach's qualifications or seniority to attribute her findings to MPD; the Court may cite to this and other administrative documents in the record in analyzing the claims at bar to the extent the documents provide evidence of timing.

Sgt. Washington testified that he assigned Ms. Weeks to the Marjorie Court detail because Plaintiffs needed to be separated after they refused to obey his direct order to make an arrest based on reports of a stolen car. Plaintiffs do not dispute that they refused to obey Sgt. Washington's order. Instead they cite to hearsay or lay opinion testimony which is inadmissible in federal court, in particular, testimony from Sgts. Branham and Rosenthal giving their opinions that Sgt. Washington bore ill will towards Plaintiffs. See, e.g. , Branham Dep. at 29; Jones OHR Letter of Determination: Cause Finding at 9-10 (July 16, 2010) (quoting Sgt. Rosenthal) [Dkt 97-5]. Opinion testimony from lay witnesses is generally inadmissible in federal court. See Fed. R. Evid. 701.

The District also contends that because none of these personnel decisions is "actionable" they do not support the hostile work environment claim. Mot. 37. As applied to the remaining claims at bar, all of which are based on a hostile work environment theory, this point is incorrect on the law: individual allegations need not be actionable to support a hostile work environment claim.

Sgt. Branham testified that officers in heterosexual relationships were permitted to ride together, see Branham Dep. at 16-17, 26, 29; recalled that she had heard Sgt. Washington saying he was going to "get" Plaintiffs, id. at 20; and stated that Plaintiffs had been separated by Sgt. Podorski or Sgt. Washington in Roll Call assignments. Id. at 26. Plaintiffs also cite to other portions of Sgt. Branham's testimony in which she attributes motives to the alleged behavior of Sgts. Podorski and Washington. To the extent that these portions of Sgt. Branham's testimony are raised to prove the truth of the matter asserted-that is, to assign discriminatory motives to Sgts. Podorski's and Washington's actions-they are, of course, hearsay and inadmissible and also lay opinion that is inadmissible. See Fed. R. Evid. 801(c) ; see also Fed. R. Evid. 701 (restricting opinion testimony by lay witnesses to opinions that are "rationally based on the witness's perception," and "helpful to clearly understanding the witness's testimony or to determining a fact in issue").

Because there is insufficient evidence in the record to support a claim that Sgt. Washington's actions were motivated by hostility based on sexual orientation, his alleged use of loaded terms ("the butch one" and "the femme one") when speaking privately to his girlfriend, a non-employee, cannot support an allegation that his actions were motivated by hostility based on sexual orientation. As will be explained below, the Court finds that the allegations concerning some of Sgt. Washington's remarks (e.g. , "You and your girl f-ked up") and behavior could support Count VII, which alleges a retaliatory hostile work environment, but not Count I, which alleges a hostile work environment based on sexual orientation. Even as alleged, Sgt. Washington's behavior was not "severe" or "pervasive" enough to create a hostile work environment on the basis of sexual orientation.

The District also concedes April 1, 2009, as the filing date for the Title VII charges. See Mot. at 57 (acknowledging that Ms. Jones's complaint was amended on April 1, 2009, and citing Ms. Niehuss's email to OHR for this date); see also D.C. Office of Human Rights, How to File a Complaint, https://ohr.dc.gov/service/file-discrimination-complaint (last visited Mar. 8, 2018) (noting that "submi[ssion]" to OHR constitutes filing a complaint); U.S. Equal Employment Opportunity Commission, How to File a Charge of Employment Discrimination, https://www.eeoc.gov/employees/howtofile.cfm (last visited Mar. 8, 2018) (providing that a state or local agency that enforces employment-discrimination laws can automatically cross-file a charge with EEOC). Plaintiffs' arguments that their amended OHR complaints were filed prior to April 2009 are unavailing. On December 23, 2008, Plaintiffs' counsel sent letters notifying MPD of Plaintiffs' intention to amend their complaints. See Weeks OHR File at 20; Jones OHR File at 20. Plaintiffs contend that, for purposes of the Title VII analysis, the 300-day limitations period should be measured from December 23, 2008. To the contrary, the statute is clear that the relevant date is when a charge is actually filed under Title VII. See 42 U.S.C.A. § 2000e-5(e)(1) (providing that "[a] charge under this section shall be filed" within three hundred days of the alleged unlawful action and separately providing for notice to the employer).

To support her sex discrimination charge, Ms. Weeks cites a concurrence from the Ninth Circuit, Latta v. Otter , 771 F.3d 456 (9th Cir. 2014) (Berzon, J., concurring), as well as an amended denial of rehearing from the Seventh Circuit, Muhammad v. Caterpillar Inc. , 767 F.3d 694 (7th Cir. 2014), as amended on denial of rehearing, (Oct. 16, 2014). See Weeks Opp'n at 30 n.11 and accompanying text (arguing that discrimination on the basis of sexual orientation is illegal under Title VII). The Court is aware that there has been some expansion of Title VII in some jurisdictions as Ms. Weeks argues, see, e.g., Zarda v. Altitude Express, Inc. , 883 F.3d 100 (2d Cir. 2018) (en banc); however, the Court disagrees with the logic behind these decisions, and the case law is, at best, unsettled. Moreover, there is no D.C. Circuit precedent departing from the established interpretation of federal law that harassment based on sexual orientation does not support a claim of gender discrimination under Title VII and DCHRA clearly differentiates the two statuses.

Since Ms. Weeks had just been promoted, it seems implausible that there were other investigators who had less experience than she.

Ms. Jones's arguments, which largely mirror Ms. Weeks's, see Jones Opp'n at 29-31, would be similarly unavailing if they were timely.

Plaintiffs point to other incidents in support of their retaliatory hostile work environment claims, but many of these allegations are too attenuated in time and insufficiently extreme or suggestive of retaliatory animus to have contributed to a severe or pervasive hostile work environment. For this reason, the Court finds that, as a matter of law, neither CDR Maupin's reassignment of Ms. Weeks to the midnight shift in May 2008, nor his allegedly telling Ms. Jones she need not "follow" Ms. Weeks "everywhere she [goes]," can support the retaliatory hostile work environment claim. See Jones OHR Complaint (Apr. 20, 2009). Nor can Ms. Jones's contention that she was prevented from leaving work early to visit Ms. Weeks in the hospital after Ms. Weeks was in a car accident, also in May 2008. Id. These appear to have been discrete incidents and the record cannot support an assumption that they were motivated by animus stemming from the OHR complaints.